# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 7, 2011

## STATE OF TENNESSEE v. RACHEL LEIGH JESSIE

**Direct Appeal from the Circuit Court for Carroll County**
**No. 10CR167      Donald E. Parish, Judge**

---

**No. W2011-00282-CCA-R3-CD  - Filed May 25, 2012**

---

Defendant, Rachel Leigh Jessie, was indicted by the Carroll County Grand Jury in a seven-count indictment for two counts of selling Methylendioxymethamphetamine (MDMA or "Ecstasy"), a Schedule 1 controlled substance; one count of selling 13.5 grams of marijuana; and four counts of selling counterfeit MDMA.  Defendant pleaded guilty to two counts of selling MDMA, both Class B felonies, and one count of selling marijuana, a Class E felony, with the manner and length of her sentence to be determined by the trial court.  The remaining charges were dismissed.  Following a sentencing hearing, the trial court sentenced Defendant as a standard offender to eight years in community corrections after serving one year incarcerated for each of the two counts of selling MDMA, and two years in community corrections after serving 180 days incarcerated for selling marijuana.  Defendant's sentences were ordered to be served concurrently with each other.  Defendant appeals her sentences and asserts that the trial court erred by denying a sentence of full probation.  Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Mike Mosier, Jackson, Tennessee, for the appellant, Rachel Leigh Jessie.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Hansel Jay McCadams, District Attorney General; and R. Adam Jowers, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

*Sentencing hearing*

At the sentencing hearing, TBI investigator Ken Rhodes testified that on February 5, 2010, he and a confidential informant, whose person and vehicle were searched, drove to the parking lot of E.W. James supermarket and met with Defendant and Cody Beecham. Investigator Rhodes gave the informant $280 to purchase an ounce of marijuana and ten Ecstacy pills. When they arrived, the informant got inside Defendant's vehicle. A "couple of minutes" later, the informant returned to Investigator Rhodes' vehicle and gave him "the dope." Cody Beecham then approached Investigator Rhodes' vehicle and asked him if he "was going to sell them or eat them, and before [he] could respond, [Beecham] said, 'eat the tye [sic] dyed ones.'" Investigator Rhodes testified that Defendant was driving the vehicle.

Investigator Rhodes submitted the substances to the TBI lab for testing. Seven of the tablets tested positive for MDMA, a Schedule I controlled substance, and three tablets tested negative. The plant substance tested positive for marijuana and weighed 13.5 grams.

On February 24, 2010, Investigator Rhodes was wired with an audio and video recording device. He met Defendant and Christy Adams at the E.W. James store and purchased 13 Ecstacy pills from Defendant. He gave Defendant $150 plus the cost of gas for a total of $180.00. Defendant was driving the vehicle. Investigator Rhodes testified that Defendant appeared "carefree" and did not show any fear or hesitation about the transaction.

On March 3, 2010, Investigator Rhodes again met Defendant at the E.W. James market. He again was wearing an audio/video recording device. Defendant arrived with another female, and Investigator Rhodes purchased 20 Ecstacy pills from Defendant for $300.00 plus the cost of gas for a total of $340.00.

Investigator Rhodes testified that he arranged another transaction with Cody Beecham to take place on March 8, 2010, where Mr. Beecham was supposed to bring 50 Ecstacy pills for $600.00 plus the cost of gas. On that date, Investigator Rhodes met Mr. Beecham and Defendant at E.W. James supermarket and purchased 50 pills. He gave Mr. Beecham $600.00 for the pills, and he gave Defendant $40.00 for gas. Defendant was driving.

Investigator Rhodes testified that on March 11, 2010, TBI Special Agent Mandy Chestnut, who "had made several buys from a subject by the name of Jonathan Short," had arranged to purchase 50 Ecstacy pills from Mr. Short for $650.00. Mr. Short arrived to that transaction in Defendant's vehicle, driven by Defendant. Agent Chestnut purchased the pills from Mr. Short.

Investigator Rhodes had arranged another transaction with Cody Beecham to take place on April 9, 2010, where he was going to purchase either 50 or 100 Ecstacy pills from Mr. Beecham at the E.W. James store for either $600.00 or $1,200.00. Defendant arrived with Beecham in Defendant's vehicle, driven by Defendant, and Investigator Rhodes purchased 50 Ecstacy pills from Beecham for $800.00. He gave Defendant $100.00. Defendant and Beecham were taken into custody during that transaction.

On cross-examination, Investigator Rhodes testified that his main point of contact throughout all of the transactions was Mr. Beecham. He testified that not all of the tablets purchased during the transactions contained MDMA.

Dwayne Hamm, a youth services officer with the Henry County Juvenile Court, testified that Defendant had previously been adjudicated delinquent as a juvenile for offenses in Henry County. Defendant was charged with underage possession of alcohol, for which she was granted pretrial diversion; she was charged with a curfew violation while on pretrial diversion, but the curfew violation was later dismissed; she was charged with truancy, which was dismissed upon completion of all the "requirements"; and she was charged with possession of drug paraphernalia, for which she was adjudicated delinquent and placed on probation. Defendant was discharged from probation for that charge on February 4, 2010.

Corporal Lance Perry, with the Henry County Sheriff's Department, testified that on January 3, 2011, he stopped the vehicle Defendant was driving for failing to stop at a stop sign in Paris, Tennessee. There were two passengers in the vehicle, Megan Presgrove and an unnamed juvenile. When Corporal Perry stopped the vehicle, he observed the passengers "immediately throwing stuff into their mouth[s]." He asked Defendant to exit the vehicle, and he noticed a "stout" odor of cinnamon or peppermint. He asked Defendant what they had put in their mouths, and she answered that it was gum and candy. Defendant gave him consent to search the vehicle. Corporal Perry found a bottle of rum and a bottle of vodka, one under the front passenger's seat and the other behind the back seat, and a marijuana pipe in a purse on the front passenger's side floorboard. Before searching the purse, Corporal Perry asked who the purse belonged to, and Defendant and both passengers denied that it belonged to any of them, stating that it belonged to a friend named Courtland. Defendant told Corporal Perry that she thought the alcohol might have been her brother's alcohol. Defendant was charged with possession of drug paraphernalia and possession of alcohol. Corporal Perry testified that Defendant did not appear to be intoxicated. Corporal Perry testified that he overheard Defendant, while seated in his patrol car, ask the juvenile what she had done with one of the bottles of alcohol, and the juvenile replied that she had "stuck it behind the seat [of Defendant's vehicle]."

Lieutenant Thomas Lankford, of the Paris Police Department, testified that he knew Defendant through his other employment as an assistant manager at the Paris Civic Center. Defendant was employed there as a lifeguard. Lieutenant Lankford testified that Defendant was a conscientious employee and had an "excellent work ethic." He testified that Defendant was "a wonderful person" who had "made mistakes[,] there is no doubt about that." He believed Defendant had a "drug problem." Lieutenant Lankford was aware of Defendant's recent arrest, and he testified that her employment was terminated as a result of the charges. He was also aware that she had undergone some outpatient treatment for substance abuse, and he believed that with the proper treatment, she could "go on to be a productive citizen in life and get healthy and get well."

Cynthia Ann Miles testified that Defendant received counseling as an outpatient at Gateway Foundation, a substance abuse treatment center in Carbondale, Illinois. Defendant was diagnosed for opiant dependence and marijuana abuse. Defendant received treatment between July 12, 2010 and December 1, 2010. Defendant was discharged after completing her treatment. Ms. Miles recommended that Defendant be placed in a residential treatment program with increased supervision.

Roma Keeney, Defendant's grandmother, testified that Defendant lived with her in Illinois after her arrest for the charges in the present case in April, 2010. Ms. Keeney testified that she kept a "tight reign" on Defendant. Defendant was a good student and had been applying to colleges. Ms. Keeney enrolled Defendant in the treatment program at Gateway. After Defendant completed the program, she wanted to return to Paris. Ms. Keeney testified that Defendant went back to Paris for "just two weeks, and she was getting back with her friends, and it wasn't working." Defendant then returned to her grandmother's home. Ms. Keeney testified that she would support Defendant if Defendant were placed on probation.

Defendant, age 17, testified that she dated Cody Beecham for "about a year" but that she had not had any contact with him since her arrest. At the time of her arrest, she lived with her mother in Paris, Tennessee. She testified that she started drinking alcohol and smoking marijuana three or four times per week at the age of 14 after her parents divorced. When she met Mr. Beecham, she "move[d] on to a lot more drugs," specifically Oxycontin, Xanax, Adderall, and Ecstacy. She testified that her mother worked "quite a bit," leaving her unsupervised. Defendant testified, "I guess I really don't like the feeling of being sober. I don't know, just an escape. I like the getting high." She testified that Mr. Beecham obtained the drugs to sell, she drove him to the locations to sell them, and he gave her "some of the money out of it." When he was in jail, she bought "fake" pills at Walgreen's and sold them because she "started really liking the money." Defendant testified that she thought "nothing could hurt [her] and [she] could never get caught."

On cross-examination, Defendant admitted that the transactions in this case occurred immediately after she was released from probation by the Henry County Juvenile Court. Regarding her decision to move back to Henry County after completing the treatment program, she testified, "I wanted to try to see if I could do it, see if I could handle it, and I wasn't ready, no." She testified that after going to live with her grandmother, she continued to use drugs, stating "[w]henever I got out of [the] house I smoked a blunt." Her grandmother was not aware of her drug use. Defendant admitted that she initially lied to evaluators at Gateway about the extent of her drug use.

At the conclusion of the sentencing hearing, the trial court found that Defendant had failed to comply with a condition of her release into the community in that "during the pendency of this action she has been cited, in lieu of arrest, for criminal charges that she frankly and candidly admits she is guilty of here today in her own testimony, while in Henry County just days ago." Additionally, the court noted that Defendant committed the first of the offenses charged in this case the day after she was released from probation by the Henry County Juvenile Court. In mitigation of Defendant's sentence, the trial court found that Defendant's conduct neither caused nor threatened serious bodily injury, but the court noted that the risk to "innocent persons, or at least person[s] who weren't undercover officers, had they been a customer of [Defendant], was present." Finally, the court stated:

> The Court would note here that [Defendant] engaged in this course of criminal conduct full knowing what she was doing. She understood very well that she was dealing with dangerous substances. She was willing to engage in them, and she did so by her own admission for a profit motive, in addition to simply wanting to fit in, perhaps, with the group that she was a part of.
>
> She did it not on one occasion, but on repetitive occasions and involving large quantities of this particular Schedule [I], Controlled Substance.

The trial court also considered Defendant's lack of prior criminal convictions and noted that "there are certainly some redeeming characteristics. She's a reasonably successful student. She has held various jobs. She clearly has a good work ethic and that is to be valued." Regarding Defendant's potential for rehabilitation, the trial court found that Defendant's prior attempts at rehabilitation were unsuccessful. The court stated,

> [Defendant] is not a dumb person. She's smart. She's articulate. She's very capable of understanding the risks and benefits of her behavior. The Court can only conclude that she has made the conscious decision to disregard all of the help that is being offered to her and to continue to

engage in a course of conduct that is destructive to her and dangerous to the community.

So the Court finds that she's not without some potential for rehabilitation, but frankly, ma'am, there are only so many resources in society and you have used up your share.

The court found that measures less restrictive than confinement have frequently and recently been applied unsuccessfully to Defendant and stated,

[I]t is possible that [Defendant] can abide by the terms of probation if the system has her attention. It's obvious that the system does not have your attention up to today, but we will see what happens after today, but up to this point, [Defendant has] blown all this off. Nothing that anybody has said or done . . . has made a difference to you.

The court found that a sentence of full probation would unduly depreciate the seriousness of the offense and that confinement "very clearly . . . is called for in this case as an effective deterrent. . . ." The trial court sentenced Defendant as a Range I standard offender to concurrent sentences of eight years for each Class B felony conviction and two years for her Class E felony conviction. The trial court imposed split confinement, ordering Defendant to serve one year of her sentence incarcerated with the remainder to be served on community corrections.

The trial court ordered Defendant to complete high school and to submit to weekly random drug screens until she reported to jail. Defendant submitted to a drug screen immediately following sentencing and tested positive for THC. Defendant admitted to having used marijuana.

*Analysis*

Defendant asserts that the trial court erred by denying full probation. Specifically, Defendant argues that the proof does not support the trial court's finding that confinement was necessary to deter others and that the trial court erred by not giving greater weight to Defendant's age at the time of the offenses.

On appeal, we must review issues regarding the length and manner of service of a sentence *de novo* with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40–35–401(d) (2006). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record

that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The defendant has the burden of showing the impropriety of the sentence. Tenn. Code Ann. § 40–35–401(d) (2006), Sentencing Comm'n Comments. This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court "may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Any sentence that does not involve complete confinement is an alternative sentence. *See generally State v. Fields*, 40 S.W.3d 435 (Tenn. 2001). Tennessee Code Annotated section 40–35–102(5) gives courts guidance regarding the types of individuals who should be required to serve their sentence in confinement:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]

A defendant who is not a priority candidate for incarceration under Tenn. Code Ann. § 40-35-102(5) and "who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" Tenn. Code Ann. § 40-35-102(6). Because Defendant was convicted of two Class B felonies, the trial court correctly determined that Defendant was not considered a favorable candidate for alternative sentencing. However, Defendant was eligible for probation because her sentence was ten years or less and the offenses for which she was sentenced are not specifically excluded by statute. Tenn. Code Ann. § 40–35–303(a) (2010). A trial court shall automatically consider probation as a sentencing alternative for eligible defendants. *Id*. § 40–35–303(b) (2006). However, "the defendant is not automatically entitled to probation as a matter of law." *Id*. § 40–35–303(b) (2006), Sentencing Comm'n Comments. Rather, the defendant must demonstrate that probation would serve the ends of justice and the best interests of both the public and the defendant. *See State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (citation omitted).

When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background

and social history, his or her present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public. *See State v. Kendrick*, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citing *State v. Grear*, 568 S.W.2d 285 (Tenn. 1978)). The court should also consider the potential for rehabilitation or treatment of the defendant in determining the appropriate sentence. *See* Tenn. Code Ann. § 40–35–103(5) (2010). In addition, the principles of sentencing require the sentence to be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id*. § 40–35–103(2), (4) (2010). In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed[,]" and "[t]he length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence[.]" *Id*. § 40–35–103(5). Finally, the Tennessee Supreme Court has held that truthfulness can be indicative of a defendant's potential for rehabilitation. *See State v. Nunley*, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999) ("Lack of candor and credibility are indications of a defendant's potential for rehabilitation."); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983) (citing *State v. Poe*, 614 S.W.2d 403, 404 (Tenn. Crim. App. 1981)) (A defendant's truthfulness "is certainly a factor which the court may consider at a probation hearing.").

We conclude that the record shows that the trial court properly considered all relevant sentencing principles and the evidence presented at the sentencing hearing. The record supports the trial court's conclusion that a sentence of split confinement was necessary to provide an effective deterrent and to avoid depreciating the seriousness of the offense. Defendant had also previously failed at attempts to rehabilitate. Defendant continued to engage in criminal conduct after her arrest in this case and after completing a drug rehabilitation program. Defendant tested positive for marijuana on the day of her sentencing. We note that only one of the above findings would support a denial of full probation. Defendant is not entitled to relief.

## CONCLUSION

The judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE